IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

DAVID WILLIAMS,
ADC #78730                                                                      PLAINTIFF

VS.                          CASE NO. 5:05CV00048JMM/HLJ

LARRY NORRIS, et al.                                                 DEFENDANTS

## PROPOSED FINDINGS AND RECOMMENDATIONS

## INSTRUCTIONS

The following recommended disposition has been sent to United States District Court Judge James M. Moody.   Any party may serve and file written objections to this recommendation. Objections should be specific and should include the factual or legal basis for the objection.  If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection.  An original and one copy of your objections must be received in the office of the United States District Court Clerk no later than fourteen (14) days from the date of the findings and recommendations.   The copy will be furnished to the opposing party.    Failure to file timely objections may result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different, or additional evidence, and to have a hearing for this purpose before the District Judge, you must, at the same time that you file your written objections, include the following:

1.      Why the record made before the Magistrate Judge is inadequate.

2.      Why the evidence proffered at the hearing before the District Judge  (if such a  hearing is granted) was not  offered at  the hearing before the Magistrate Judge.

1

3.     The detail of any testimony desired to be introduced at the hearing before the District Judge in the form of an offer of proof, and a copy, or the original, of any documentary or other non-testimonial evidence desired to be introduced at the hearing before the District Judge.

From this submission, the District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

Clerk, United States District Court
Eastern District of Arkansas
600 West Capitol Avenue, Suite A149
Little Rock, AR 72201-3325

## DISPOSITION

A trial was held before the Court in this matter on February 2-4, 2010. Following submissions of testimony and evidence, the parties filed post-trial briefs (DE ##324-326). Having considered the file, the evidence and testimony presented, and the post-trial briefs, the Court now renders the following Findings and Recommendations.

### I.  Case History

Plaintiff is a state inmate incarcerated at the Varner Super Max Unit (VSM) of the Arkansas Department of Correction (ADC). He filed this action against defendants in February, 2005, alleging violations of his due process and equal protection rights with respect to his continuous incarceration in administrative segregation since 1999. By Order and Judgment dated August 22, 2006 (DE ##207, 208), this Court granted defendants' motion for summary judgment, and dismissed plaintiff's complaint. On appeal, the Eighth Circuit Court of Appeals affirmed the Court's decision on

2

plaintiff's equal protection claim, and reversed with respect to its decision on the due process claim (DE #234).  Specifically, the Court held, "there remains an unresolved fact issue on this record as to whether Williams actually received meaningful reviews (of his administrative segregation status), rather than sham reviews, as he contends."  On remand, the Court scheduled this case for a hearing to determine the meaningfulness of plaintiff's reviews.  In addition, by Order dated January 6, 2009 (DE #263), the Court granted the motion for partial summary judgment with respect to plaintiff's allegations against defendants Norris and Brewer, and dismissed those defendants from this action.

A Court trial began on April 6, 2009.  After hearing testimony from three witnesses, the Court held the case in abeyance for the purposes of appointing counsel to represent plaintiff, and to address the issue of the absence of one of plaintiff's requested witnesses.  Counsel was then appointed to represent plaintiff on April 29, 2009, and the trial was conducted on February 2-4, 2010.

## II.  Plaintiff's History in the ADC

Plaintiff was initially incarcerated in the ADC in 1981 for murder.  In 1982, he was convicted of murdering a fellow inmate, and thereafter served thirty days in punitive segregation and one and one-half years in administrative segregation (AS).  In July 1983, plaintiff was released to general population (GP) at the Tucker Maximum Security Unit (MSU).  In 1995, plaintiff was injured in an attack by another inmate, and was thereafter assigned to AS for his own safety.  He was transferred to the Utah State Prison system in 1996 pursuant to an interstate compact agreement due to a lack of available bed space, and returned to the ADC in June 1999.  Upon his return, he was housed in AS at MSU under defendant Harmon until defendant Harmon was replaced by defendant Evans in October 2002.  Defendant James also served as assistant warden during this time.  Plaintiff was transferred to the VSM Unit in September 2003 under the supervision of Warden Rick Toney.

Toney was replaced by defendant Harris in February 2004, who supervised plaintiff until June 2006. During most of plaintiff's time at VSM, defendant Moncrief served as the assistant warden. Plaintiff was then transferred to the East Arkansas Regional Unit (EARU) in June 2006, where Warden Harmon supervised him until January 2008. At that time, plaintiff was transferred back to the VSM Unit, where he continues to be incarcerated. From the time of his return to Arkansas in June 1999, until March 2009, plaintiff was housed in the AS areas of those Units. Defendant Hobbs was an assistant deputy director of the ADC during much of this time, and became acting director of the ADC in January 2010.

### III. ADC Administrative Segregation Policy

Administrative Directive (AD) 96:08, effective July 19, 1995, AD 01-11, effective April 30, 2001, and AD 01-11, effective December 29, 2006 (Plaintiff's Exhibits 1, 2, 11) were policies in place during plaintiff's incarceration in AS. According to these policies, an inmate is placed in AS "if his/her continued presence in the general population poses a serious threat to life, property, self, staff, or other inmates. Also, inmates who threaten the security or orderly running of the institution may be segregated." The policies provide that an inmate receives written notice of a classification hearing, and is permitted to appear at the hearing to make statements and present evidence and testimony. The committee then recommends, by a majority vote, whether to place an inmate in AS. The policies state the inmate will be advised of the reasons in writing, and all decisions are subject to review and approval or disapproval by the Warden or his/her designee.

While an inmate is housed in AS, he/she is housed in a separate area of the institution and receives mail/television/radio privileges. Meals are routinely served in the cells and inmates are provided shower opportunities no less than three times per week. Their status is to be reviewed

every thirty days by the Committee, and the Mental Health staff also must review the status of every

inmate assigned for more than thirty days.  Finally, the policies provide as follows:

> No inmate shall remain in a segregation classification for more than one year
> unless he has been personally interviewed by the Warden at the end of one
> year and such action is approved by him.  At the end of the second and each
> additional year that an inmate remains in a segregation classification, he must
> be personally interviewed by both the Warden and the Deputy/Assistant Director,
> who will then determine whether or not continuation in that status is necessary
> and/or appropriate.

The classification committee is routinely composed of the warden, assistant warden, chief

of security, a member of mental health and a classification officer.  The warden has the ultimate

authority to approve or deny the recommendation of the committee (T Vol. I, p. 54).

### IV.  Plaintiff's Disciplinary History (Defendants' Ex. 4)

Prior to plaintiff's transfer to Utah in 1996, plaintiff was charged with and convicted of

several disciplinary violations.   In February 1990, he was convicted of a disciplinary after testing

positive for cannabinods.   In January 1993, he was convicted after attempting to mail a letter to an

inmate at another Unit.   Plaintiff was convicted again after testing positive for cannabinods in

January 1994, and December 1994.   When plaintiff returned to the ADC, he was convicted in July

2001, of possession of contraband, involving cigarettes, marijuana and money.   Plaintiff was

convicted in October 2002, of failure to obey an order from an officer, and in November 2004,

plaintiff was convicted of possession of contraband, when tobacco and pills were found in his cell.

Finally, in January 2005, plaintiff was convicted of providing false information to an officer during

the course of an investigation.

### V.  Testimony at the Trial

A.  Defendant Harmon (Transcript, Vol. I, pp. 26-131; Vol. II, pp. 198-307)

Defendant Harmon was warden over plaintiff at the MSU  from June 1999 until October 2002.  He also served as warden over plaintiff at the EARU from June 2006 until January 2008. Part of his duties as warden at both Units was to serve on the classification committee, and he possessed the authority to approve or disapprove any committee recommendation. (Transcript Vol. I, p. 54)   Plaintiff was initially placed in AS upon his arrival at the MSU in June 1999, and the classification committee thereafter voted to retain plaintiff there for his own safety, and because of a threat to the security and good order of the institution (Defendants' Ex. 1 pp. 7-8) .  In September 1999, the committee voted to retain plaintiff in AS, and no reason was provided in writing (Defendants' Ex. 1 p. 10).  On October 27, 1999, the committee voted to release plaintiff to GP. This decision was overruled by defendant Harmon, who considered plaintiff a threat to the security and good order of the institution.  (Defendants' Ex. 1 p. 11)  Harmon testified that in rendering this decision, he looked at the totality of the circumstances and plaintiff's entire institutional file and history.  Harmon considered plaintiff's history of murder in the 1980s, allegations against him of trafficking in drugs, information received from Utah, and the attack on plaintiff in 1995.  (Transcript Vol. I, p. 67)

Thereafter, the classification committee voted to retain plaintiff in AS on December 29, 1999, February 23, 2000, April 26, 2000, June 22, 2000, and August 23, 2000.  (Defendants' Ex. 1, pp. 13-18)  On all those occasions, except for the August 23, 2000, date, no reasons were listed by the committee members for their decisions.  Plaintiff was transferred to EARU for eleven days in October 2000, and upon his return to the MSU he was assigned to AS, with no written reason provided.  (Defendants' Ex. 1, pp. 19-28)  On December 20, 2000, the committee voted to retain plaintiff in AS, due to his history of assault (Defendants' Ex. 1 p. 30).  On February 14, 2001, and

April 18, 2001, the committee voted to retain plaintiff in AS.   The written record of the April hearing shows that plaintiff asked the committee whether they were holding the 1982 murder against him.  There is no indication on that record how the committee responded to plaintiff, but they voted to retain him because of his history of assault and his threat to the security and good order of the institution. (Defendants' Ex. 1 pp. 32-33)

Harmon also testified concerning the lack of mental health reviews received by the plaintiff. In October 1999, Harmon received a letter/memo from Emma Prater, of the MSU Mental Health Department, stating she found no mental health reasons for retaining plaintiff in AS after assessing him.  (Plaintiff's Ex. 4, p. 109)  Harmon noted that Prater qualified her statement with an additional sentence: "However, Inmate Williams is a known drug dealer and it is my professional belief that, if released, he will return to traffic and trading in drugs".   Two additional mental health services segregation review forms were completed on December 21, 1999, and February 16, 2000, which stated, "There are no Mental Health reasons for this inmate to remain as currently assigned.  Security and/or custody status issues will be addressed by the Classification Committee."  (Plaintiff's Ex. 4, pp. 111-112).

Although the parties presented no documents labeled mental health "assessment", as set forth in the AS policy, several mental health forms were completed in 1999-2003, and again in 2006-2008, categorizing plaintiff as rational, normal, and manipulative.  (Plaintiff's Ex. 4 pp. 110-141) Plaintiff filed a grievance on March 1, 2002, complaining he was denied participation in anger management and SATP programs, and that he had not received periodic reviews, as provided in the AS policy. (Plaintiff's Ex. 10)   Defendant Harmon stated that, while he responded to plaintiff's grievance, he failed to address the mental health issue, due to an oversight. (Transcript Vol. II, pp. 199-201)

Harmon also admitted an oversight in failing to implement and enforce the AS policy requiring a director's review of plaintiff's AS status in 2001. (Transcript Vol. II, p. 210)

Defendant Harmon stated he did not remember any specific activities by plaintiff between April 2001, and October 2002, which would have affected his or the committee's vote, other than that plaintiff was considered a threat. Defendant stated plaintiff had a history of contraband and was considered a "major player". (Transcript Vol. II, pp. 214-216) Defendant admitted no specific written document existed to substantiate his suspicions and concerns. Defendant Harmon left his position at the MSU in October 2002, when he was assigned to another Unit.

Defendant Harmon encountered plaintiff again in June 2006, when plaintiff was transferred to EARU as a Class 1 inmate. Due to plaintiff's institutional history and their consideration of him as a threat, the committee housed him in AS, with defendant Harmon's approval. (Transcript Vol. II, pp. 147-8) Harmon added that a standard practice existed whereby all inmates arriving from EARU were automatically initially housed in AS. (Transcript Vol. II, pp. 227-8) He also stated if an inmate is housed in AS for seven years, he has no opportunity to get into trouble and that explained why plaintiff reached Class 1 status. (Transcript Vol. II, p. 233) During plaintiff's time at MSU from 2006-2008, Harmon stated no psychological results were attached to the AS review forms. (Transcript pp. 44-5)

In August 2006, plaintiff's request to be moved to another barracks where he would be housed in a cell with a bar door (as opposed to a solid door), was disapproved by the committee, due to a pending disciplinary violation against plaintiff. This disciplinary charge was later dismissed and in November 2006, the committee recommended granting plaintiff's request to be moved to a different barracks. Defendant Harmon disapproved this, however, stating plaintiff was still a danger.

(Defendants' Ex. 1 p. 162).   The committee then continued to vote to retain plaintiff in AS through December 19, 2007.  (Defendants' Ex. 1, pp 164-189) On several of those occasions, the committee gave no reason for retaining plaintiff in AS.

Defendant Harmon testified he received no new information about plaintiff between June 2006 until January 2008 which factored into his decisions.   He considered plaintiff's mental problems, violence, disruptions, rule violations – the "totality of everything" – in concluding plaintiff should remain in AS.  He stated he receives a lot of undocumented information about inmates and plaintiff's name kept surfacing. He also stated he can not completely dismiss an inmate's history from his mind when making a decision concerning AS confinement.  (Transcript Vol. II, pp. 266-274)

B.  Defendant Moncrief (Transcript Vol. II, pp. 134-191)

Defendant Moncrief was the assistant warden at VSM during plaintiff's time there from September 2003 until June 2006.   Part of his duties included participating in the classification committee hearings, and in the warden's absence, approving or disapproving the recommendations. Defendant chaired the committee in Warden Harris' absence on March 9, 2004.  At that time, a majority of the committee recommended plaintiff's release to GP.  Defendant, Moncrief, however, disapproved their recommendation, considering plaintiff as a threat to the security of the institution. (Defendants' Ex. 1 p. 93)  Moncrief admitted plaintiff had not caused him trouble while at VSM, but denied his release because of his history of murder, assault, and as a threat to the good order of the institution.   In addition, Moncrief noted plaintiff had been charged with several disciplinary violations.  At the trial, defendant Moncrief testified even if plaintiff had been perfect, he would still be in favor of keeping him in AS.  (Transcript Vol. I, p. 150)   He stated he personally observed

9

plaintiff in and out of his cell, and in most cases, "once a threat to security, always a threat." (Transcript Vol. I, p. 151).   Defendant participated in additional committee hearings at which plaintiff's requests to be released from AS were denied, on June 16, 2004, August 19, 2004, October 21, 2004, November 23, 2004, March 29, 2005, April 7, 2005, April 25, 2005, and May 13, 2005. (Defendants' Ex. 1, pp. 98-121)

C.  Defendant James (Transcript Vol. II, pp. 403-439)

     Tommy James was the deputy warden at the MSU from June 2001 until February 2007.  Part of his duties included conducting AS hearings.  He first encountered plaintiff at the MSU in 1987, and after the attack in 1995, he never knew plaintiff to be involved in violence. (Transcript Vol. II, p. 405)  He participated in committee hearings on June 13, 2001, August 15, 2001, and April 15, 2002, at which the vote was to retain plaintiff in AS.  On October 23, 2002, he chaired a committee hearing where plaintiff asked to be released from AS.  The committee voted to retain plaintiff in AS, as a threat.  James testified that at some point in time, he suspected plaintiff of controlling the distribution of contraband in the Unit, but never started a formal investigation concerning such. (Transcript Vol. II, p. 412)  He stated he initially voted to retain plaintiff in AS in 2001 because of the attack on plaintiff in 1995, and because there was a note in the record concerning possible retaliation against that other inmate by plaintiff.  (Transcript Vol. II,  p. 414)  He stated the ADC would not have been able to retain as much control over plaintiff if he was in GP, but that he never heard evidence about violence or disruptions by plaintiff during his time at the MSU.  However, James stated he never voted for plaintiff to be released from AS because of the threat to security and his suspicion of plaintiff's involvement with contraband.  (Transcript Vol. II, p. 422)

D.  Defendant Evans (Transcript Vol. III, pp. 442-475)

Marvin Evans was the warden while plaintiff was at the MSU from October 2002 until September 2003.  He testified that he did not specifically recall presiding over classification committee hearings involving plaintiff, yet his signature does appear on many forms reflecting plaintiff's hearings.  Such hearings occurred October 23, 2002, February 26, 2003, March 26, 2003, April, 2003, May 21, 2003, June 25, 2003, and July 30, 2003.  (Defendants' Ex. 1, pp. 58-76) During those hearings, the committee recommended plaintiff be retained in AS, mostly citing him as a threat to the security of the institution, but on a couple of occasions, because of plaintiff's inability to adjust to GP.  He testified no single incident or fact came into play in his decisions to continue plaintiff in AS, and the decisions were based on the totality of information available to him at the time.  (Transcript Vol. III, p. 472)

E.  Defendant Harris (Transcript Vol. III,  pp. 475-560)

Grant Harris has been the Warden at VSM since February 2004.  Plaintiff was incarcerated there from February 2004 until June 2006, and from January 2008 until the present.  Harris was not present at the classification committee hearing in March 2004, when defendant Moncrief overruled the committee's recommendation to release plaintiff to GP.  Harris stated he was not even aware of that fact until sometime after April 2006.  (Transcript Vol. III, p. 481)  He did participate in the committee hearings on June 16, 2004, August 19, 2004, and October 21, 2004, when the recommendations were to keep plaintiff in AS, as a threat.  He testified the fact that plaintiff was incarcerated in AS was the reason plaintiff was no trouble.  In January 2005, the committee (including Harris) voted to deny plaintiff's request for release to GP, with no written reason given. (Defendants' Ex. 1, p. 111)   In March 2005 and April 2006, Harris was present when plaintiff's request again was denied, as a threat.  However, in June 2006, the committee recommended that

plaintiff be released upon transfer.  Harris testified this meant that if plaintiff was transferred to another Unit, that Unit would have the option to release him to the GP.  (Transcript Vol. III, p. 522) However, when plaintiff was transferred to EARU soon thereafter, he was placed in AS at that Unit.

Plaintiff returned to Varner in January 2008, and was assigned to AS due to his past history, according to defendant Harris. (Transcript Vol. III, p. 526)  In February 2008, plaintiff was given a special assignment, as part of a "step-down" program, whereby he would work in the Unit during the day and be locked down at night.  This program worked well with plaintiff, but the committee continued to recommend that he remain in AS, in March 2008, April 2008, July 2008, and December 2008. (Defendants' Ex. 1, pp. 196-206)  Harris was not present at the July 2008 meeting, where the committee noted plaintiff had been on special assignment for 120 days, and referred his continued housing in AS to defendant Harris. (Defendants' Ex. 1, p. 200) Harris testified no documents reflect that he took any action in response to that referral.  (Transcript Vol. III, p. 535)  In February 2009, the committee voted for plaintiff to remain on AS, but that he would be reviewed for release in March.  Harris was not present at that meeting.  He was present, however, when the committee approved plaintiff's release to GP in March 2009.    Harris stated he did not vote for plaintiff's release prior to that date, because he did not feel plaintiff was ready, after considering the totality of plaintiff's behavior while incarcerated. (Transcript Vol. III, p. 554) Harris further stated he can have concerns without specifically documenting those concerns, and continues to be concerned that plaintiff is "walking a fine line."  (Transcript Vol. III, p. 558)

F.  Defendant Hobbs (Transcript Vol. III, pp. 559-601)

Ray Hobbs is now the acting director of the ADC, effective January 2010.  He testified he was chief deputy director prior to that for over five years.  Pursuant to the ADC AS policy, plaintiff

was to be reviewed by the deputy director yearly, after he was in AS for two years.  Plaintiff filed a grievance in September 2002, complaining that he had not received a director's review, even though he had been in AS since June 1999.  (Plaintiff's Ex. 5)  Hobbs responded to that grievance, and stated in his testimony that he erred in the grievance by stating plaintiff had been reviewed in October, 2001.  (Transcript Vol. III, p. 565)  He stated he was interested in making sure plaintiff received his reviews, and thereafter directed the wardens and other staff to check their records to ensure that inmates received their annual reviews, per policy.  (Transcript Vol. III, p. 566)

Plaintiff's first director's review was conducted on December 30, 2002, at which time Hobbs agreed with the committee that plaintiff continue to be housed in AS as a threat to security. Plaintiff's next review was not conducted until April 2005, at which time the committee and Hobbs voted for plaintiff to remain in AS.  Hobbs again met with plaintiff and the committee in April 2006 at which time he noted that he wanted to review plaintiff's status in sixty days.  However, Hobbs testified that he did not remember why he noted such, or any other specifics about that meeting.   A subsequent meeting did not occur.  (Transcript Vol. III, p. 573)

The next two director's reviews were held in December 2007 and February 2009, at which the committee voted to retain plaintiff in AS.  Hobbs was not present at the March 2009 meeting at which plaintiff was released to GP, but was contacted by Harris to confirm his approval of the release.   Hobbs testified he had a conversation at some point in time with the Unit psychiatrist, Dr. Kelly, who told him plaintiff was calculated and could strike at any time.  (Transcript Vol. III, p. 588)  Hobbs also stated plaintiff's behavior improved during the step-down program.  (Transcript Vol. III, p. 591)  Finally, he stated that when he reviewed plaintiff's status during the annual reviews, he took into consideration plaintiff's institutional file, his adjustment, job assignments, comments

13

from supervisors, and anything in plaintiff's file.  (Transcript Vol. III, pp. 595-596)

G.  Plaintiff Williams (Transcript Vol. III, pp. 602-644)

David Williams testified he served a total of 4,846 days in AS, and that the inmate who attacked him in 1995 stayed a total of fifty-six days in AS.  (Transcript Vol. III, p. 607)  He stated that defendant Harmon, the first warden who assigned him to AS, once told him that as long as he (Harmon) was warden, plaintiff would not be released from AS.  (Transcript Vol. III, p. 608) Plaintiff acknowledged that after he returned to the ADC from Utah, he did receive some disciplinary charges, but those charges were raised only once during a classification hearing.  (Transcript Vol. III, pp. 608-9)   Plaintiff stated no one ever asked him to explain any of the disciplinaries at the hearings, although several members asked him about his 1982 murder conviction.

Williams stated defendant James often told him it was up to the boss (Harmon) when Williams would be released from AS.  (Transcript Vol. III, p. 610)  He noted that when he was at VSM in 2003, defendant Moncrief handled most of the AS reviews, and later told plaintiff as long as he was assistant warden, plaintiff would not be released from AS (Transcript Vol. III, p. 611). In his director's reviews, plaintiff stated defendant Hobbs did not provide him with specifics as to why he was considered a threat to security.  Plaintiff further stated Warden Evans never told him why he did not allow him out of AS and never referred to any of plaintiff's disciplinary charges. (Transcript Vol. III, p. 614)  Similarly, plaintiff stated Warden Harmon  did not tell him, when plaintiff was at the MSU in 2006, why he was not released from AS.   Plaintiff stated although the committee told him in July 2008 that they were referring him to Harris for GP consideration, nothing was ever said to him by Harris until February 2009.  (Transcript Vol. III, p. 617)

During his years in AS, plaintiff testified he requested numerous times to be permitted to

participate in anger management, SATP, and basic life principle programs, but was denied.  He stated he finally completed an anger management program in September 2008.  (Transcript Vol. III, p. 618)  He believed the classification committee would provide him with the opportunity to be released to GP, but was denied more than one hundred times since 1999.  He stated it "eats at you, mentally, spiritually, drives you nuts" and at one point he went on a fast for over 100 days. (Transcript Vol. III, p. 624) He stated he "found religion", which kept him from going crazy, and witnessed things in AS which caused him emotional problems.  (Transcript Vol. III, p. 625)  Some of these "things" included watching an inmate commit suicide, listening to constant yelling and screaming and insanity from other inmates, and suffering from a lack of sleep.

Plaintiff further explained that although he told the classification committee in February 2009 that previous problems occurred when he was housed in an open GP barracks, that did not mean that he did not want to be released to GP.  Plaintiff testified that in some Units, GP housing takes place in cells, as opposed to open barracks in other units.   He further stated his biggest concern in an open barracks is that there is a "total lack of respect" and while in a cell you can escape from the "nonsense and stupidity."   He also noted it was more difficult to be in an open barracks where inmates abuse drugs, drink alcohol and smoke cigarettes.  (Transcript Vol. III, p. 626)

Finally, plaintiff testified about injuries he suffered while incarcerated in AS.  He stated in 2004, he passed out and hit his head on a table in his cell and was unable to obtain help for quite awhile because of his placement in AS behind a solid door.  Furthermore, inmates in AS must be cuffed behind their backs when they are transported, and this resulted in shoulder injuries to plaintiff on at least two occasions.  Plaintiff also stated one time while cuffed he fell down stairs and injured his left ankle, knee and shoulder.  (Transcript Vol. III, pp. 620-622)

15

H.  Testimony from non-parties

1) Ruby Evans - (Transcript Vol. II, pp. 307-333) - Ms. Evans testified she worked as a classification officer at the VSM  Unit in 2008 when plaintiff was transferred from EARU.  She stated although nothing bad or adverse was stated to her about his behavior, she did not think she could release him from AS because he had been locked up for so long.  (Transcript Vol. II, pp. 310-312).  She stated when plaintiff was approved for the step-down program, she does not recall anyone ever saying how long he would need to participate in that program before being released to GP.  She stated plaintiff needed to gradually work his way into GP and when the committee voted to release him they felt he was ready.  (Transcript Vol. II, pp. 321, 325)  Ms. Evans did state plaintiff was afraid to go to GP at that time, and the committee had to convince him that it would work.  Finally, Ms. Evans stated that during the classification hearings no one ever stated plaintiff was a drug dealer.

2) Jared Byers (Transcript Vol. II, pp. 334-343) - Byers worked at VSM in various capacities during the times plaintiff was incarcerated at that Unit.  He testified plaintiff never demonstrated any violent tendencies and never caused him to be fearful for his safety. (Transcript Vol. II, p. 335)  Byers also stated he never suspected plaintiff of dealing drugs or trafficking contraband, and he was not aware of any investigations involving plaintiff.   He further stated plaintiff was polite and respectful, and always said he wanted out of AS.   Finally, he did recall something involving defendant Moncrief stating plaintiff would be locked up as long as he (Moncrief) was there.  (Transcript V. II, p. 340)

3) Revonna Walker (Transcript Vol. II,  pp. 343-402) - Ms Walker was employed as a classification and review officer at VSM since 2003.  She testified concerning plaintiff's Ex. 13, which included email messages to Hobbs about conducting director's review hearings.  She also

testified concerning an email from Hobbs to a classification officer at the MSU, stating Hobbs wanted plaintiff transferred there.  However, in another email, officers at MSU refused to accept plaintiff, and therefore, Hobbs withdrew his request.  (Transcript Vol. II, p. 355)  Ms. Walker testified that plaintiff always requested a transfer or release from AS at the committee hearings and that the votes to deny the requests were because violence surrounded plaintiff when he was not segregated and housed by himself.  (Transcript Vol. II, pp. 367, 397)  She also noted plaintiff did not indicate a lack of remorse for the 1982 murder.  (Transcript Vol. II, p. 398)  She did not remember that plaintiff was given specific reasons to explain the committee's decisions, other than that he was a threat because of his institutional file.

## VI.  Post-Trial Briefs

### A.  Plaintiff's Brief (DE #324)

Plaintiff maintains that throughout his ten-year incarceration in AS he failed to receive meaningful reviews of his AS status.  Noting that the Eighth Circuit Court of Appeals stated meaningful reviews required defendants to offer evidence to support their decisions that plaintiff remained a security threat, plaintiff states he was not provided such justification following any of his AS reviews.  Plaintiff states he never received notice of the factual basis supporting the committee's decision, was not provided a psychological assessment as required by the ADC policy, and did not engage in violent behavior after 1982.   Referring to each of the defendants, plaintiff notes how they failed to provide him due process and relied solely on a few incidents in his distant past to support their decisions to keep him in AS.   Plaintiff states these reviews were "sham" and as a result, he suffered substantial damages for his lengthy confinement in AS.  Plaintiff states defendant Harmon testified it did not matter to him how long plaintiff engaged in good behavior

17

because he would not release him from AS. In addition, plaintiff states defendant Moncrief stated it did not matter if plaintiff was a perfect inmate – he would not vote to release him. Defendant Evans did not know whether he was aware of negative information about plaintiff, and can not remember what he considered when voting to keep plaintiff in AS. Plaintiff states defendant Harris continued to rely on plaintiff's distant past history when making his decisions and concluded plaintiff should remain in AS because he had been there for so long. Plaintiff notes defendant Hobbs ignored his responsibilities to conduct yearly director's reviews, and could not recall reviewing plaintiff's institutional jacket or the reasons for denying plaintiff's requests for release.

With respect to damages, plaintiff states he suffered a number of physical injuries while incarcerated in AS, in addition to the emotional damage caused by stress associated with knowing that while he continued to remain in AS, the inmate who assaulted him in 1995 only spent fifty-six days in AS. He also states he believes the law supports an award of damages for unlawful confinement to AS without a showing of physical or emotional injuries. He argues that a showing of intentional deprivation of the following – regular human contact, eating with other prisoners, visiting the Unit library, possessing personal property, and having a job – supports a finding of injury. Plaintiff asks to receive damages of $150 per day, apportioned among the defendants, from October 1999 through March 2009. In addition, plaintiff states he is entitled to receive punitive damages from defendants, noting they were unable to describe the specific reasons underlying their decisions to keep him in AS, instead referring to the "totality" of the circumstances. Plaintiff notes defendants admitted he often was not provided with the factual basis for their decisions, and states their continued conduct shows a pattern of deliberate indifference to his treatment.

B. Defendants' Brief (DE #325)

Initially, defendants state this case is moot, given the fact that plaintiff was released from AS on March 12, 2009. At that time, defendants state, plaintiff obtained the relief he sought by bringing this action, and therefore, no due process analysis is required.

In the alternative, defendants state two issues remain before the Court: 1) whether plaintiff received meaningful reviews while housed in AS, and 2) whether defendants provided plaintiff with the reasons for his continued confinement in AS. Defendants describe the content of the classification committee reviews, at which time the inmate is permitted to speak, the committee members can ask questions, the inmate's institutional jacket is available for review, and the committee members each cast their vote concerning the issue raised before them. Each of the named defendants served as the chair of the committee, or as the Warden of the Unit where plaintiff was incarcerated, and each summarized the information considered when rendering the decision to maintain plaintiff in AS:

1) Harmon- This defendant testified he looks at the totality of the information available to him when making his decision, including the inmate's disciplinary history. Defendants state the record of plaintiff's disciplinaries was available to Harmon when he made his decisions, and he also testified he would have taken into consideration plaintiff's 1982 murder conviction and the fact that he spent over three years in AS while incarcerated in Utah. He also testified how staff members would periodically report that plaintiff continued to be involved in trafficking of money and drugs, and stated not every piece of information relied upon was documented. In addition, Harmon attributed plaintiff's positive behavior to the fact that he was not around others to get into trouble. Harmon states he cast the deciding vote on only one occasion, on October 27, 1999, when the committee recommended plaintiff's release, and Harmon voted he be retained. During the remaining

19

reviews in which he participated, the vote by all committee members was for plaintiff to remain in AS.  Finally, Harmon stated plaintiff was always notified verbally and in writing concerning the committee's decisions.

2) James - Defendants state at all times James participated in the committee hearings, all the committee members voted for plaintiff to remain in AS.  He stated he took many different variables into consideration when making his decisions, including plaintiff's past history, suspicions that plaintiff was involved in contraband, and plaintiff's institutional file.  Finally, he stated he followed his custom and practice of verbally informing inmates of the reasons why they were to remain in AS.

3) Evans - Evans testified he considered the inmate records, inmate testimony, and any information from the staff, before making his decision.  Following the hearings in which he participated, plaintiff was notified in writing concerning the committee's decision.

4) Moncrief - Moncrief testified he would have reviewed plaintiff's institutional jacket, looked at past experiences including disciplinary history, his personal experiences with plaintiff, and anything positive to indicate plaintiff was attempting to improve his behavior and situation.   At the time he overruled the committee's recommendation to release plaintiff to GP in 2004, defendant stated he did not feel it was the right thing to do, because he was not yet familiar with plaintiff and he relied on plaintiff's institutional history.   In all other reviews he participated, defendant states the committee unanimously recommended for plaintiff to remain in AS.

5) Harris - Harris testified he looks at an inmate's behavior, his institutional history, his job and disciplinary history, and considered plaintiff's history when rendering his decision .  He also stated the fact that plaintiff was on AS for such a lengthy period of time accounted for him staying out of trouble and staying safe, and that AS is intended to protect an inmate from both himself and

others.

6) Hobbs - During the director's reviews, he stated he considered plaintiff's institutional file, institutional adjustment, job assignments, comments from supervisors, programs he completed, and whatever plaintiff offered in support of himself.  He also stated he depends on the Unit staff to provide him with updated information about the inmates.  He recalled an incident when he was told by an officer that plaintiff was clever and manipulating, and also a conversation with a psychiatrist that plaintiff was calculated.  He stated this information was considered when deciding whether to release plaintiff.

Finally, defendants state plaintiff's claims are barred by the physical injury requirement of the Prison Litigation Reform Act (PLRA), which provides that an action can not be brought by a prisoner "for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e.  Defendants also state plaintiff does not establish a causal relationship between his claimed physical injuries and his continued confinement in AS.  Although defendants acknowledge that a prisoner may recover punitive damages based only on an award of nominal damages, they object to punitive damages in this case, because plaintiff has not proven defendants acted with evil intent, or that their conduct was willful or malicious .

C.  Plaintiff's Reply Brief (DE #326)

Plaintiff notes that even though he spent twelve years in GP following the murder of another inmate in 1982, defendants erroneously continued to rely on that 1982 conviction to support his incarceration in AS from 1995 until 2009.  In addition, defendants failed to abide by the committee votes in support of releasing plaintiff from AS, they failed to explain to plaintiff the factual basis for their decisions, they failed to maintain proper records, and provided reasons which were a pretext

for plaintiff's continued confinement.  Plaintiff notes that the Eighth Circuit Court of Appeals held

that defendants offered "no evidence, for example, about Williams' behavior or demeanor while in

ad seg, his psychological status, or their day-to-day dealings with him, nor any evidence from which

it could be concluded that Williams had a generally volatile or disruptive character."  Despite this,

however, defendants state they looked to the "totality of the record" to justify their decisions, and

that on most occasions, all members of the committee voted to deny plaintiff's release from AS.

Plaintiff states this does not comply with the Eighth Circuit's requirements for the "reasons" for

plaintiff's AS confinement, or for meaningful reviews.

Although defendants consistently noted that their decisions were based on plaintiff's threat

to the good order and security of the institution, plaintiff states they never informed him of the

factual basis supporting their decisions.  Plaintiff argues this does not constitute a meaningful

review.  Plaintiff also objects to defendants' recent characterization of this action as "moot," and

asserts that the only reason plaintiff was released from AS in March 2009, was because the original

trial date in this action was scheduled for April 2009.  Furthermore, plaintiff argues that a case is not

moot if it is "capable of repetition, yet evading review," citing Roe v. Wade, 410 U.S.113 (1973).

## VII.  Applicable Law

### A.  Liability

In Sandin v. Conner, 515 U.S. 472, 483-87 (1995), the Court recognized that while inmates

do not possess a due process liberty interest in freedom from administrative or punitive segregation,

the states themselves may create protected liberty interests.  Those interests are "limited to freedom

from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise

to protection by the Due Process Clause...imposes atypical and significant hardship on the inmate

in relation to the ordinary incidents of prison life." In originally granting defendants' summary judgment motion in this case (DE #207, August 22, 2006), this Court held that the length of time plaintiff spent in the AS unit of the ADC constituted an atypical confinement, within the meaning of Sandin, supra.

While the Eighth Circuit Court of Appeals affirmed that conclusion, and further found that the sixty-day reviews plaintiff received were sufficient to satisfy due process, the Court remanded to this Court the determination of whether the reviews plaintiff received were "meaningful." The Court noted that "Williams correctly argues that undue weight should not be given to an inmate's past conduct (in this case, distant past) in reviewing his ongoing ad seg status." 277 Fed.Appx 647, 2008 WL 2003319, p. 4 (8th Cir.). The Eighth Circuit further noted that defendants "offered no evidence whatsoever as to why they concluded, after each hearing before a committee tasked with reviewing Williams's housing status, that he remained a security threat." Id. The Court cited Kelley v. Brewer, 525 F.2d 394, 399 (8th Cir. 1975), where that court, recognizing that "it is not the function of federal courts to embroil themselves unduly in matters of prison administration..." (citing Wolff v. McDonnell, 418 U.S. 539 (1974)), noted that inmates do possess certain rights which are protected by the Constitution. While recognizing the need to segregate individual inmates at times from the general population, the Court in Kelly noted that "administrative segregation is not punitive and it looks to the present and the future rather than to the past....it should be emphasized that the reason or reasons for the segregation must not only be valid at the outset but must continue to subsist during the period of the segregation." Kelly, 525 F.2d at 400.

The Eighth Circuit also cited another case involving a lengthy administrative segregation confinement, Shoats v. Horn, 213 F.3d 140, 144 (3d Cir. 2000). In that case, an inmate challenged

23

his eight-year stay in administrative confinement, and argued defendants improperly based his continued confinement solely on his past crimes of murder, escape, kidnaping and assault.   The Court noted inmate Shoats was also confined based on the assessment of prison officials who evaluated him that he was a current threat to the security and good order of the institution, and to the safety of other people.   The Court further stated,

> Even were we to conclude that Shoats' continued confinement in administrative custody is based solely on his past crimes, the process he received would nonetheless pass constitutional muster, because predictions of likely future behavior based on a generally volatile criminal character have been upheld by the Supreme Court.

Id. at 146.   The Court then cited Hewitt v. Helms, 459 U.S. 460, 474 (1983), where the Supreme Court stated that prison administrators should consider the "character of the inmates confined in the institution, recent and longstanding relations between prisoners and guards, prisoners inter se, and the like....an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents."

In citing to Shoats, the Eighth Circuit Court of Appeals in plaintiff's appeal, noted that the administrative review committee relied on psychological evaluations of Shoats which characterized him as a "remorseless sociopath knowledgeable in the workings of prisons and escape techniques, capable of leading other inmates in such undertakings, and inclined to do so."   Shoats, supra, 213 F.3d at 142.

B.   Damages

The PLRA, 42 U.S.C. § 1997e(e), provides that "[n]o federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury

suffered while in custody without a prior showing of physical injury."  In <u>Royal v. Kautzky</u>, 375 F.3d 720, 723 (8th Cir. 2004), the court held that the PLRA did not intend to bar recovery for all forms of relief, and absent physical injury, plaintiffs may recover nominal and punitive damages and injunctive and declaratory relief.  <u>See</u> <u>also</u> <u>Fegans v. Norris</u>, 537 F.3d 897, 908 (8th Cir. 2008).

In addition, punitive damages may be assessed in a § 1983 action when a "defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." <u>Smith v. Wade</u>, 461 U.S. 30, 56 (1983). Furthermore, in determining whether a defendant's conduct meets the threshold for awarding punitive damages, this court "should consider the two purposes of punitive damages: (1) punish willful or malicious conduct; and (2) deter future unlawful conduct." <u>Royal</u>, <u>supra</u>, 375 F.3d at 724.

VIII.  Analysis

A.  Liability

1) Defendants Harmon, Moncrief, James, Evans, and Harris

Each of these defendants, as wardens or assistant wardens, served as the chair of the classification committee hearings sometime between 1999-2009.  As testified to by defendant Harmon, as chair of the committee, each of these defendants possessed the authority to approve or disapprove any committee recommendation.  On each of the occasions, the AS forms completed by the committee chair reflected that plaintiff's request to be returned to GP (or to be assigned to an AS cell with a bar door) was rejected, either due to a threat to the security and good order of the institution or due to plaintiff's history of assault.  (Defendants' Ex. 1).  On three of those occasions, in March 2003 (nearly four years after his placement in AS), June 2003, and July 2003, defendant Evans signed a form which stated plaintiff also demonstrated a chronic inability to adjust in the

general population.  (Defendants' Ex. 1, pp. 67, 73, 76) (The June 2003 form also indicated plaintiff had been charged with a disciplinary violation.)   On numerous occasions, however, no written statement of the decision of the committee was provided on the forms submitted.

While each of the defendants testified that their decision was based on the "totality" of the circumstances, which included plaintiff's murder convictions in the 1980s, the assault on plaintiff in 1995, and a drug history in the 1980s-1990s, none of the defendants could point to specific instances in the plaintiff's institutional file indicating a sufficiently specific post-1999 reason for considering plaintiff a "threat" to the security and good order of the institution.  It is clear that plaintiff was not disciplinary-free during his time in AS; as noted above, and as found in defendants' Ex. 4, plaintiff was convicted of three disciplinary violations between October 2002 and January 2005.  However, defendants provided no testimony or evidence that plaintiff tested positive for drug use after his return to the ADC from Utah in 1999, even though they cited his drug history as a reason to retain him in AS.  The Court does not discount defendants' testimony that many times they consider information which is not specifically recorded when rendering their decisions, including suspicions fueled by talk from other inmates and guards.  However, defendants could not testify to, nor could they produce written documents which included, specific reasons to support their conclusions that plaintiff continued to pose a threat.

The Eighth Circuit noted in its May 12, 2008, Opinion that "undue weight should not be given to an inmate's past conduct (in this case, distant past) in reviewing his ongoing ad seg status." (DE #234)   In addition, the court cited Kelley v. Brewer, supra, for the proposition that administrative segregation looks to the present and the future and not to the past, and the reasons for the continued segregation "must continue to subsist during the period of the segregation."  525 F.2d

at 400.

The Court finds in this case that defendants improperly relied on the plaintiff's distant past in rendering their decisions to retain him in AS, and failed to support their belief that he was a continuing threat by setting forth specific reasons for their decisions. The Court finds this case differs markedly from Shoats v. Horn, supra, relied upon by the defendants, where the inmate's past conduct was deemed sufficient to support his continued stay in AS. In that case, the defendants relied on specific evidence which showed that Shoats' dangerousness "subsisted" through the period of his segregation, including psychological reports. In this case, however, the defendants presented no specific documentary evidence to support their continued conclusions that plaintiff was a threat to the security and good order of the institution. In addition, defendant Harmon admitted that the psychological assessments which are supposed to be conducted as part of the AS reviews, did not occur. [1]

The Court finds, therefore, that the reviews conducted under the auspices of these defendants were not "meaningful" and therefore, that plaintiff's due process rights were violated by his continued incarceration in AS from 1999-2009.

2) Defendant Hobbs

As a deputy director and chief deputy director, defendant Hobbs supervised at least two Units, and relied on the Wardens and other staff to schedule the annual reviews of plaintiff and other inmates housed on AS for more than one year. In addition, he testified he did not review an inmate's

---

[1] The Court recognizes that a failure to follow policy does not in and of itself support a finding of a constitutional violation. See Williams v. Nix, 1 F.3d 712 (8th Cir. 1993). However, submission of a psychological assessment was one factor noted by the Court in Shoats, supra, as evidence in support of that committee's decision. Therefore, it could have been useful in supporting the decisions of the committees in this case also.

entire file and institutional history prior to each review, and relied on the Unit staff for information concerning the particular inmate in question. (Transcript Vol. III, pp. 599-600 ) The Court finds that his participation in five director's reviews over the course of plaintiff's stay in AS was not sufficient to impose liability in this matter.

B.  Damages

_____1) Actual Damages - Initially, this Court must determine if plaintiff suffered any actual damages as a result of his incarceration in AS.  Although plaintiff alleges suffering physical injury on several occasions while incarcerated in AS, the Court finds such injuries were not the direct result of his continued AS incarceration.  Other than those isolated incidents, however, plaintiff did not testify to, or otherwise present evidence of actual damages as a result of his incarceration.  Therefore, the Court finds plaintiff is not entitled to actual or compensatory damages.

2)  Nominal Damages - In <u>Carey v. Piphus</u>, 435 U.S. 247, 267 (1978), the United States Supreme Court held the deprivation of a right to procedural due process without proof of actual damages warrants only an award of nominal damages.    The Court stated,

> [b]ecause the right to procedural due process is "absolute" in the sense that it does
>  not depend upon the merits of a claimant's substantive assertions, and because
> of the importance to organized society that procedural due process be observed,
> we believe that the denial of procedural due process should be actionable for
> nominal damages without proof of actual injury.

<u>Id</u>.

In <u>Fegans v. Norris</u>, 4:03cv00172JMM (August 25, 2006), the Court found defendant knowingly violated established law requiring Kosher diets from December 19, 2002 until March 3, 2004, and awarded plaintiff nominal damages in the amount of $1,500.    In affirming that award, the United States Court of Appeals for the Eighth Circuit noted that the PLRA limits recovery for

mental or emotional injury to nominal damages only, and concluded  "that an award of $1.44 for each constitutional violation is a sufficient nominal damage award..."  537 F.3d 897, 908 (2008). In addition, the Court in <u>Royal v. Kautzky,</u> <u>supra,</u> upheld the lower court's award of $1.00 in nominal damages to the inmate plaintiff, after finding a violation of his First Amendment rights and access to the courts.    In support of its decision, the Court also cited <u>Carey v. Piphus,</u> <u>supra</u>, and <u>Risdal v. Halford,</u> 209 F.3d 1071 (8th Cir. 2000), where the court stated nominal damages in the amount of $1.00 should be awarded for First Amendment violations.

In this case, plaintiff testified that upon his return from Utah, he was incarcerated in AS for a total of 4,846 days.  (T Vo. III, p. 607).  This allegation was not challenged by the defendants. Therefore, having found defendants Harmon, Moncrief, James, Evans, and Harris liable to plaintiff for a violation of his due process rights, the Court finds plaintiff should be awarded nominal damages of $1 for each day in administrative segregation.  This totals $4,846.00.

2) Punitive Damages - Punitive damages may be awarded when a "defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." <u>Smith v. Wade</u>, 461 U.S. 30, 56 (1983).   In this case, the Court does not find that the defendants' decisions to keep plaintiff in AS were motivated by evil intent, or reckless or callous indifference to plaintiff's rights.   Rather, the Court finds although defendants truly believed that plaintiff was a danger to the security and good order of the institution, such belief was improper.   The defendants continued to give undue weight to plaintiff's past behavior, and failed to provide legally sufficient reasons for his continued confinement in AS. Accordingly,

IT IS, THEREFORE, ORDERED that plaintiff shall have judgment against defendants

Harmon, Moncrief, James, Evans, and Harris, and shall be awarded nominal damages in the amount of $4,846.00.

IT IS FURTHER ORDERED that plaintiff's claims against defendant Hobbs are hereby DISMISSED.

IT IS SO ORDERED this __16th___ day of ____April_____, 2010.


                                           /s/Henry L. Jones, Jr.

                                           United States Magistrate Judge